## Ed Burch v. The State.

### No. 3320.   Decided November 22, 1905.

**1.—Theft of Mule—Evidence—Corroboration.**

On trial for theft of a mule, where the testimony of a State's witness was attacked, there was no error to admit testimony showing the contemporaneous statement made by said witness in the grand-jury room to corroborate his examination in chief.

**2.—Same—Evidence—Circumstances.**

See opinion for facts offered as circumstances, the probative force of which was for the jury and which was therefore admissible.

**3.—Same—Leading Questions.**

Where on a trial for theft of a mule the State's witness was an unwilling witness, there was no objection in asking him leading questions.

**4.—Same—Leading Questions—Harmless Error.**

See opinion for facts which authorized the State to propound a leading question to a State's witness and which was not reversible error.

Appeal from the District Court of Harrison. Tried below before Hon. Richard B. Levy.

Appeal from a conviction of theft of a mule; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

No brief for appellant has reached the hands of the Reporter.

*Howard Martin,* Assistant Attorney-General, for the State.

BROOKS, Judge.—This conviction is for theft of mule—appellant's punishment being assessed at confinement in the penitentiary for a term of five years. The evidence, though circumstantial as to the taking is amply sufficient to sustain the verdict. Appellant was found in possession of the mule recently after it was stolen, and attempted to trade and sell the mule.

Bill of exceptions number 1 shows that R. A. Sexton was permitted to testify, as follows: "I am county attorney of Harrison County, and was present in the grand jury while the case of Ed Burch was being investigated. A negro, whose name is Alexander, I think, testified under oath before the grand jury that defendant Ed Burch had told him that he expected to trade off the mule he was riding to Bob Buggs.

The negro, I mean, is the only one who testified about defendant trading the mule off. I am not certain that the name of the party that witness said defendant expected to trade the mule to was Bob Buggs." Various objections are urged to this testimony in the bill, and appended thereto is the following explanation by the court: "Witness Humphreys was the witness intended and understood by witness Sexton, and district attorney and jury. That witness Humphreys testified he had testified before the grand jury in this case, and the purpose of the testimony of witness Sexton was to show that witness Humphreys had sworn to same fact in former judicial inquiries as he had on the trial in this case, as against the evidence of defense that Humphreys had made contrary statements, to enable the jury to pass upon the weight and credibility of the evidence of witness Humphreys." This explanation, in the light of this record, clearly disposes of appellant's objections. The record shows that the defense proved by various witnesses that the State's witness Humphreys had made a contradictory statement to the one testified to by the county attorney, and hence contemporaneous statements made by said witness, corroborative of his statement on the examination in chief, was germane testimony, and properly admitted.

The second bill shows that Alice Thadeus was permitted to testify for the State, "that on the same night I heard Capt. Floyd's mule was stolen, defendant came to my house: I don't know what time of night it was, but it was sometime after I had gone to bed, and knocked on my door. He said he wanted to get in; and I told him I would not allow anybody to enter my house at that hour. He then said, 'Excuse me,' and went out toward my yard gate, and I then heard a carriage drive by going from town. I then heard some one talking at my gate. It sounded like one person talking to another person. It did not sound like somebody talking to a horse or mule. I then heard nobody talking to a horse or mule. Yes, I heard somebody say, 'Whoa! I will knock your damned brains out.' I don't know who said this. A carriage passed by going back to town, and behind it I heard somebody, I don't know who, loping on horseback. I could not tell whether they started from my gate or not. I do not know whether defendant was still at my gate when the talking was going on or the place where the party was standing who spoke to the mule, or when the carriage passed. I do not know where the party who said, 'Whoa, I will knock your damned brains out,' was standing; that is, in front of my gate, or in the middle of the road. A little time after defendant left my front door, when I heard the party speak to the mule or horse, as I have testified to." Appellant urges various objections to this testimony. The bill is approved with this qualification: "That the testimony was offered as circumstances, and the probative force of the evidence is for the jury, and objections would not reach the probative force, and it is a question of probative force rather than admissibility." This testimony was admissible.

And by the same witness the bill further shows, that the county

attorney asked the following question, "Did you hear somebody talking to a horse or mule at your gate"; and witness answered "no." The State then asked, "Did you hear somebody say something like they were talking to an animal, as 'Whoa, I will knock your damned brains out'?" The witness answered, "yes." Appellant objected because the question was leading. The court states that the witness was an unwilling witness for the State. This being true, the mode of examination was authorized by law.

Bill number 3 shows that the State's witness, James Humphreys, testified: "Defendant stopped at my house about the time Capt. Floyd lost his mule, and stayed all night. He was riding a mule that looked like Capt. Floyd's; and described the mule. The State then asked, 'Did defendant say anything to you about trading a mule?' And witness answered, 'No.' Then the prosecution propounded the following question, 'Didn't he (defendant) tell you that he was going to Bob Buggs to trade the mule he had for a horse that Bob Buggs had?'" Appellant objected to this on the ground that the question was leading. While the question in character is leading, still we do not think it would justify this court in reversing this case. The record shows that witness had testified to various other matters indicating that appellant brought prosecuting witness' mule to his house.

· There are no errors in the record requiring a reversal, and the judgment is accordingly affirmed.

*Affirmed.*

Henderson, Judge, absent.